SIEMENS CREDIT CORPORATION,
Plaintiff,

v.

MARVIK COLOUR, INC., Defendant.

MARVIK COLOUR, INC.,
Third–Party Plaintiff.

v.

LINOTYPE HELLGRAPHICS COMPANY heretofore known as Hell Graphic Systems, Inc., d/b/a "Hell Graphic Systems," Third–Party Defendant.

No. 90 Civ. 7807 (MBM).

United States District Court,
S.D. New York.

July 21, 1994.

**690**

Douglas J. Kramer, Susan Packer, Baden Kramer Huffman & Brodsky, P.C., New York City, for plaintiff and third-party defendant.

Steven T. Halperin, David Halperin, P.C., New York City, for defendant and third-party plaintiff.

## AMENDED OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Siemens Credit Corporation sues to collect amounts due from Marvik Colour, Inc. pursuant to a secured equipment sales agreement (the "Agreement"). Marvik moves for summary judgment, contending that Siemens disposed of the collateral without providing notice of the sale to Marvik as required under § 9–504 of the New York Uniform Commercial Code ("N.Y.U.C.C."). Marvik argues that Siemens' failure to comply with § 9–504 forfeited Siemens' right to obtain a deficiency judgment for the remainder of the debt.

Plaintiff Siemens opposes Marvik's motion, and renews the motion for summary judgment it made in April 1991. Siemens seeks to dismiss Marvik's counterclaims on the ground that Marvik waived all claims and warranties against Siemens. In addition, third-party defendant Linotype–Hell Graphic ("Linotype") renews its motion to dismiss Marvik's third-party claims for remedies other than repair and replacement. For the reasons set forth below, Marvik's motion is denied, Siemens' motion is denied, and Linotype's motion is granted in part and denied in part.

### I.

In March 1989, Marvik agreed to purchase a computer system from Linotype, then known as Hell Graphic Systems, for $561,600. (Complt Ex. A) Marvik's obligations under the Agreement were secured with a purchase money security interest in the computer system. On or about June 6, 1989, Linotype delivered the system to Marvik.

On October 12, 1990, Linotype assigned the Agreement and security interest to Siemens. (Complt Ex. B) By letter dated Oc-tober 15, 1990, Siemens directed Marvik to make payments pursuant to the Agreement. Marvik did not comply. On November 9, 1990, Siemens notified Marvik that Marvik was in default, and on December 6, 1990, Siemens filed this action to recover the payments due under the Agreement. (Complt)

On January 31, 1991, Marvik notified Siemens that it was cancelling the Agreement, as permitted under Addendum D to the Agreement. (Ans. Ex. C) Addendum D provides, ambiguously, that Marvik may cancel the Agreement if the equipment does not perform to published specifications, within six months of "completion of equipment's performance to specifications." (Complt Ex. A at Addendum D) Marvik demanded that Siemens remove the system and refund Marvik's down payment and installation expenses within 90 days. Siemens responded that Marvik had no right to terminate the Agreement because the demand was not timely, because the equipment was performing according to published specifications, and because Marvik was contradicting its own rescission by continuing to use the equipment.

On March 1, 1991, Marvik served its answer, alleging various defenses and counterclaims against Siemens. On March 5, 1991, Marvik commenced the third-party action against Linotype, asserting claims of breach of contract, breach of warranty, negligence and fraud. (3d–Party Complt)

On March 20, 1991, Siemens demanded that Marvik return the equipment because Marvik had defaulted in making payments. Siemens offered to remove and dispose of the equipment. Marvik, however, would not permit Siemens to remove the equipment unless Siemens first refunded Marvik's $50,000 down payment and paid approximately $100,-000 to compensate Marvik for costs incurred to install the equipment. (Pl & 3d–Party Def.1993 Mem. at 8–9; Def.1993 Mem. in Opp. at 16) Siemens then moved to compel Marvik to pay for its continued use of the equipment. Following a suggestion by the court, the parties entered a stipulation on August 12, 1991 whereby Marvik agreed to pay arrears and make on-going payments into an escrow account. The distribution of

the funds in the account will depend upon the outcome of this lawsuit.

In July 1992, Marvik ceased using the equipment and returned it to Siemens. Following protracted negotiations, the parties stipulated to the terms of the return on or about October 20, 1992. (Halperin Aff.Ex. G) The stipulation permitted Siemens to dispose of the equipment in any manner consistent with the Agreement or with the N.Y.U.C.C. Linotype, acting as Siemens' agent, removed the equipment in November 1992. Linotype then refurbished and sold the computers and work stations. The rest of the equipment was scrapped or used for parts.

According to Siemens, the sale of the refurbished items yielded $117,500; Siemens also proposed to credit Marvik $30,552 for the remaining equipment. The escrow account holds a balance of approximately $175,-000. Siemens concedes that these amounts are in dispute and contends that a trial must be held to determine the value of any deficiency. Marvik, however, now moves for summary judgment dismissing the complaint because Siemens did not notify Marvik of the sale of the equipment as Siemens was required to do under N.Y.U.C.C. § 9-504. Siemens, in turn, moves for summary judgment dismissing all of Marvik's counterclaims because the Agreement contains a provision in which Marvik agreed to waive all claims against Siemens. Linotype moves for summary judgment with respect to all third-party claims except for those seeking repair and replacement.

## II.

■ Marvik's motion for summary judgment is predicated upon Siemens' failure to comply with N.Y.U.C.C. § 9-504(3), the provision that governs the disposition of collateral after default. That section explicitly requires the secured party to provide notice of sale to the debtor:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private

sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

N.Y.U.C.C. § 9-504(3) (McKinney 1990). It is undisputed that Siemens and its agent, Linotype, failed to notify Marvik of the sale of the computers and work stations.

■ The U.C.C. does not prescribe a remedy for a failure to comply with § 9-504(3), and the New York Court of Appeals has not yet addressed this issue. Among New York's lower courts and in other jurisdictions, authority is split. The Appellate Division Second Department has imposed an "absolute bar" to recovery of a deficiency judgment. *See Long Island Bank v. Knight,* 122 Misc.2d 878, 879, 473 N.Y.S.2d 901, 902 (2d Dep't 1983); *Avis Rent A Car System, Inc. v. Franklin,* 82 Misc.2d 66, 67, 366 N.Y.S.2d 83, 85 (2d Dep't 1975); *see also Credit Car Leasing Corp. v. De Cresenzo,* 138 Misc.2d 726, 732–33, 525 N.Y.S.2d 492, 497 (N.Y.Co.1988); *Leasco Data Processing Equip. Corp. v. Atlas Shirt Co.,* 66 Misc.2d 1089, 1090–91, 323 N.Y.S.2d 13, 15–16 (N.Y.Co.1971). Under the absolute bar rule, when a secured creditor sells collateral without notice to the debtor, the creditor may not thereafter seek a deficiency judgment from the debtor to cover the difference between the value of the collateral and the amount owed. Some 11 states have adopted this view. *See* Robert M. Lloyd, *The Absolute Bar Rule in UCC Foreclosure Sales: A Prescription for Waste,* 40 U.C.L.A.L.Rev. 695, 745 (1993) (hereinafter "Lloyd").

■ In contrast, the First and Fourth Departments have held that a failure to give notice merely results in a "rebuttable presumption" that the amount recovered was equal to the debt. *See Telmark, Inc. v. Lavigne,* 124 A.D.2d 1055, 1055, 508 N.Y.S.2d 737, 738 (4th Dep't 1986); *General Electric Credit Corp. v. Durante Bros. & Sons, Inc.,* 79 A.D.2d 509, 510–11, 433 N.Y.S.2d 574, 577 (1st Dep't 1980); *Security Trust Co. v. Thomas,* 59 A.D.2d 242, 245–47, 399 N.Y.S.2d 511, 512–14 (4th Dep't 1977); *see also In re Winer,* 39 B.R. 504, 510–11 (S.D.N.Y.1984);

*Long Island Trust Co. v. Williams,* 133 Misc.2d 746, 754, 507 N.Y.S.2d 993, 999 (N.Y.Co.1986), *aff'd,* 142 Misc.2d 4, 539 N.Y.S.2d 612 (1st Dep't 1988). The rebuttable presumption rule allows the secured creditor to recover a deficiency judgment if it proves at trial the amount of the debt, the fair market value of the collateral, and the resulting deficiency. In the most recent analysis of New York's treatment of § 9–504(3), Judge Easterbrook of the Seventh Circuit wrote an opinion adopting the rebuttable presumption approach, predicting that the New York Court of Appeals would do the same. *See In re Excello Press Inc.,* 890 F.2d 896, 903–04 (7th Cir.1989) (applying New York law in a bankruptcy appeal). Some 26 other states subscribe to this rule. Lloyd, *supra,* at 745.

A third approach, known as the "setoff" rule, has been applied by the Appellate Division Third Department. *See Stanchi v. Kemp,* 48 A.D.2d 973, 974, 370 N.Y.S.2d 26, 28 (3d Dep't 1975). The setoff rule allows the debtor to prove any damages sustained as a result of the creditor's failure to give notice of the sale of collateral, and the deficiency is reduced by the amount of those damages. This approach applies § 9–507(1) of the N.Y.U.C.C., which provides that where a secured party does not proceed in accordance with requirements relating to the disposition of collateral, the debtor "has a right to recover from the secured party any loss caused by a failure to comply." N.Y.U.C.C. § 9–507(1) (McKinney 1990). Only three other jurisdictions have adopted this rule as the exclusive remedy for violations of the notice requirement. Lloyd, *supra,* at 746.

When courts determine which of the three rules to apply, they should attempt to safeguard the interests of the debtor in a manner that is fair to the secured creditor. The debtor needs to be notified of the sale so that he can 1) redeem the collateral before the sale; 2) bid on the collateral at the sale; 3) monitor the commercial reasonableness of the sale; or 4) file a Chapter 11 petition in order to stop the sale. *See* Lloyd, *supra* at 715–16; *Long Island Trust Co.,* 133 Misc.2d at 753, 507 N.Y.S.2d 993. Thus, an effective remedy should deter the secured creditor

from violating the notification provision of § 9–504(3). At the same time, the remedy should not unduly penalize the creditor, nor unduly reward the debtor for the creditor's mistake; the debtor who precipitated the sale by defaulting on a debt is certainly not to be freed lightly from fault.

Although there is authority to support applying the absolute bar rule or the setoff rule, each of these approaches is flawed. The absolute bar rule is disproportionately harsh to the creditor because it deprives the creditor of money to which it is entitled, often as punishment for a relatively minor oversight. *See Excello,* 890 F.2d at 904 (absolute bar produces penalty out of line with the gravity of the omission); *Winer,* 39 B.R. at 511 (absolute bar is inflexible and might cause too harsh a result). An absolute bar can result also in a windfall for the debtor, who is relieved of the obligation to pay a legitimate debt. *See* Lloyd, *supra,* at 735. The setoff rule alone is unsatisfactory because it does not adequately protect the debtor's right to notification. *Id.* at 723.

Combining the rebuttable presumption rule and the setoff rule best balances the interests at stake. The secured party is awarded a deficiency judgment if it proves the amount of the deficiency, and the debtor recovers damages for the failure of notice. Under this scheme, the secured party does not lose the entire value of the deficiency. However, the burden of overcoming the rebuttable presumption and the risk of damages serve to deter the secured party from flouting the requirements of § 9–504(3). Because the deficiency is measured as the difference between fair market value and the amount of the debt, the secured party bears the loss if the collateral was sold at a below-market price. Thus, the debtor is not required to pay any more or any less than it would have paid if notice had been given, and the secured party has incentive to provide notice of sale to the debtor.

As Judge Easterbrook noted in *Excello,* the rebuttable presumption approach has been applied most frequently in recent New York decisions and is preferable to the absolute bar rule. 890 F.2d at 904.

Judge Easterbrook did not, however, consider applying the setoff rule together with the rebuttable presumption rule. Nevertheless, N.Y.U.C.C. § 9–507(1) specifically provides for awarding damages for noncompliance with provisions governing the disposition of collateral, and therefore constitutes a statutory embodiment and endorsement of the setoff rule. Moreover, adoption of the rebuttable presumption rule does not preclude application of the setoff rule. Further, it seems likely that the New York Court of Appeals would allow a debtor in Marvik's position at least to try to prove its damages from lack of notice if for no other reason than that New York courts generally seek to protect the economic interests of those who do business in the state. *See, e.g., Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 383, 300 N.Y.S.2d 817, 823–24, 248 N.E.2d 576, 582–83 (1969) (seeking to protect those who come to New York to "take advantage of [its] position as an international clearing house and market place"). A debtor may suffer substantial harm from a sale without notice, particularly if the asset is worth more to the debtor than to other potential buyers. Thus, the Court of Appeals would probably allow debtors to recover damages for lack of notice, thereby applying the setoff rule as well as the rebuttable presumption rule.

█ It bears mention that imposing an absolute bar would be particularly unjust in the present case because Marvik was not harmed by the lack of notice. Marvik returned the computer system to Siemens with the understanding that the equipment would be sold. Marvik had no intention of redeeming the computers, bidding for them or stopping the sale. Nor did Marvik have an interest in monitoring the sale process. As noted, under the rebuttable presumption rule, the secured party, Siemens, absorbs any loss resulting from a below-market sale because it may recover only the difference between the fair market value of the collateral and the value of the debt.

At trial, Siemens will be given the opportunity to prove the value of the debt and the fair market value of the collateral. Marvik will be given the opportunity to prove the amount of any damages sustained as a result of Siemens' failure to comply with § 9–504(3).

## III.

Linotype moves to dismiss all of Marvik's third-party claims seeking remedies other than repair and replacement. Under § 7(c) of the Agreement, Marvik agreed that the express warranty set forth in § 7(a), which provided for repair and replacement, was "in lieu of all other warranties, express or implied" and that "all other warranties, including but not limited to all implied warranties of merchantability and warranties of fitness for a particular purpose are hereby disclaimed." (Complt Ex. A § 7(c)) The Agreement also states that, "In no event shall [Linotype] be liable for any loss of use, revenue, anticipated profits or special, indirect, incidental or consequential damages arising out of or in connection with this Agreement or the use or performance of the equipment." (Complt Ex. A § 7(c)) Relying on these provisions, Linotype argues that Marvik's claims for breach of implied warranties and for consequential damages must be dismissed because Marvik consented to limit its remedies to repair and replacement. (Pl. & 3d–Party Def.1993 Mem. at 13–16)

Siemens moves to dismiss Marvik's counterclaims because Marvik waived all claims against Siemens as Linotype's assignee. Under § 15 of the Agreement, Marvik agreed that it would not assert against Linotype's assignee "any defense, counterclaim or setoff for any reason whatsoever in any action for payment or possession brought by assignee." Marvik agreed also that the assignee would not be "chargeable with any obligations or liabilities" of Linotype. (Complt Ex. A § 15) Thus, according to Siemens, all of Marvik's counterclaims against Siemens must be dismissed.

Siemens and Linotype contend that Marvik knowingly bargained away its right to sue, receiving in exchange two exclusive remedies—a right of rescission exercisable within six months, and an express warranty. (Pl. & 3d–Party Def.1993 Mem. at 6, 15; Complt Ex. A § 7, Addendum D) In response, Marvik argues that the waiver terms in the Agreement are unenforceable because they

are unconscionable (Def.1993 Mem. at 24) or fail in their essential purpose. (Def. 1991 Mem. at 12–13; Def.1993 Mem. at 26) Siemens and Linotype further contend that Marvik's claim for rescission under Addendum D must be dismissed because Marvik continued to use the computer system after the purported cancellation. (Pl. & 3d–Party 1993 Mem. at 16–17)

Marvik admits that it has failed to state a claim for negligence, so that claim is dismissed. The motions to dismiss Marvik's claims for rescission and for breach of implied warranties are denied because material issues of fact preclude summary judgment on those issues. Siemens' motion to dismiss all counterclaims is denied because Siemens has failed to establish that the assignment of the Agreement was for value, in good faith, and without notice of claims and defenses. As for Marvik's fraud claim, Marvik has not offered any evidence to dispute Linotype's showing of lack of intent; thus, summary judgment on the fraud claim is granted in favor of Linotype.

### A. Breach of Warranty

■ In its Answer and in its Third–Party Complaint, Marvik sues for breach of both express and implied warranties. (Ans. at ¶¶ 34–51; 3d–Party Complt at ¶¶ 23–37) Marvik sues also for consequential damages in the form of lost profits.[1] However, in the Agreement, Marvik accepted an express warranty limiting its remedies to repair and replacement of defective parts, (Complt Ex. A § 7(a)) and disclaimed all consequential damages. (Complt Ex. A § 7(c))

Section 2–719(1)(a) of the N.Y.U.C.C. states that an agreement "may provide for remedies in addition to or in substitution for those provided in [Article 2 of the U.C.C.], and may limit or alter the measure of damages recoverable under this Article." Thus, parties to a contract are "given broad latitude within which to fashion their own reme-

dies for breach of contract," *Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enterprises, Inc.,* 58 A.D.2d 482, 489, 396 N.Y.S.2d 427, 431 (2d Dep't 1977) (citation omitted), and Marvik's waiver of warranties and exclusion of consequential damages are presumed to be valid.

■ However, N.Y.U.C.C. § 2–719(1)(b) provides that a party may resort to a remedy created by Article 2 where "circumstances cause an exclusive or limited remedy to fail of its essential purpose." N.Y.U.C.C. § 2–719(1)(b) (McKinney 1993). And N.Y.U.C.C. § 2–302 provides that the court may refuse to enforce an unconscionable contract, or may strike out an unconscionable term. N.Y.U.C.C. § 2–302 (McKinney 1993). Under New York law interpreting these provisions,

'The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. The Code … tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable.'

*Cayuga Harvester, Inc. v. Allis–Chalmers Corp.,* 95 A.D.2d 5, 16, 465 N.Y.S.2d 606 (4th Dep't 1983) (quoting *Chatlos Systems v. National Cash Register Corp.,* 635 F.2d 1081, 1086 (3d Cir.1980)). Marvik argues that the express warranty prescribed in the Agreement "fails in its essential purpose" because Linotype never honored the terms of that warranty. (Def.1993 Mem. in Opp. at 24, 26) Marvik further contends that the disclaimer of warranties and the consequential damages clauses are unconscionable because Marvik relied upon Linotype's expertise, and because the equipment performed only to 40% of its represented capacity. (Def.1991 Mem. at 14) Thus, Marvik asserts that it has the right to sue Siemens and Linotype for standard remedies provided for in Article 2 of the

---

**1.** Although neither the Answer nor the Third–Party Complaint explicitly seek consequential damages other than for the negligence claim, which has been dismissed, Marvik contends in its memoranda of law that it should be permitted to sue for consequential damages for its breach of warranty and breach of contract claims. (Def.1991 Mem. at 14; Def.1993 Mem. at 32–36) Moreover, Marvik listed lost profits as a large part of its alleged damages when it itemized its damages during the course of discovery. (Pl. & 3d–Party Def.1993 Mem. at 5)

N.Y.U.C.C., including breach of implied warranties under § 2–314 and § 2–315, and consequential damages under § 2–715.

### 1. *Unconscionability*

 "The determination of unconscionability is a matter of law for the court to decide." *Industralease,* 58 A.D.2d at 488, 396 N.Y.S.2d 427. Unconscionability requires " 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *State v. Avco Fin. Serv., Inc.,* 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075 (1980) (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)). Lack of meaningful choice is determined by examining the process by which the contract was formed; unreasonably favorable terms are judged by the contents of the contract. *Industralease,* 58 A.D.2d at 489 n. 4, 396 N.Y.S.2d 427. Because Marvik knowingly entered into the Agreement and because the terms at issue are not unreasonable, neither the contracting process nor the substance of the Agreement supports a finding of unconscionability.

 Marvik argues that the waiver of warranties and the exclusion of consequential damages are unconscionable because Marvik relied upon the expertise of Linotype representatives, because the computer system was defective, and because Linotype failed to honor the express warranty. (Def.1991 Mem. at 14) These allegations do not make the terms of the Agreement unconscionable. Factors that courts have considered in determining unconscionability include disparity of bargaining power, *see Fischer v. General Electric Hotpoint,* 108 Misc.2d 683, 683, 438 N.Y.S.2d 690, 690 (Suffolk Co.1981), an "atmosphere of haste and pressure," *see Industralease,* 58 A.D.2d at 489, 396 N.Y.S.2d 427, and lack of understanding by one of the parties, *see Jefferson Credit Corp. v. Marcano,* 60 Misc.2d 138, 141, 302 N.Y.S.2d 390, 393–94 (1969). Indeed, "there is a presumption of conscionability when the contract is between businessmen in a commercial setting." *American Dredging Co. v. Plaza Petroleum Inc.,* 799 F.Supp. 1335, 1339 (E.D.N.Y.1992). Because Marvik actively negotiated the Agreement in the course of its business, and because the waiver terms were clearly visible and understood, there is nothing unconscionable about the manner in which the terms of the contract were negotiated.

As for the reasonableness of the waiver and exclusion provisions, the Agreement is not a contract which "no man in his senses and not under delusion would make." *Industralease,* 58 A.D.2d at 488, 396 N.Y.S.2d 427. Contract terms waiving implied warranties and excluding consequential damages are not uncommon, and New York courts have held that waivers of claims are "not against public policy." *FDIC v. Frank L. Marino Corp.,* 74 A.D.2d 620, 620, 425 N.Y.S.2d 34, 35 (2d Dep't 1980). Although it is true that waivers of negligence or fraud claims will not be enforced, *FDIC* at 621, 425 N.Y.S.2d 34, Marvik has withdrawn its negligence claim, and Marvik's fraud claim is dismissed on independent grounds below. *See* op. at pp. 697–698, *infra.* Thus, neither the substance of the contract nor the process of negotiation was unconscionable. This determination renders valid Marvik's waiver of consequential damages, and Marvik's claims for such damages are dismissed. The waiver of warranties, however, must be examined also under N.Y.U.C.C. § 2–719(1)(b), to ascertain whether the express warranty "fails in its essential purpose."

### 2. *Failure in Essential Purpose*

 Whether a limited remedy in a contract that is intended to replace a different remedy under the U.C.C. fails in its essential purpose is a question of fact, not law. *Piper Acceptance Corp. v. Barton,* 1987 WL 5801, *2, 1987 U.S.Dist. LEXIS 175, *6 (S.D.N.Y.1987); *Cayuga Harvester,* 95 A.D.2d at 10–11, 465 N.Y.S.2d 606. A remedy fails in its essential purpose when, while it " 'may have appeared fair and reasonable at the inception of the contract, as a result of later circumstances [it] operates to deprive a party of a substantial benefit of the bargain.' " *Cayuga Harvester,* 95 A.D.2d at 11, 465 N.Y.S.2d 606 (quotation omitted). A party who has consented to a limited warranty of repair may be deprived of a substantial

benefit of the bargain when there is a delay in repair, or when there is a "total inability to repair." *Id.; see also Philip M. Damashek, P.C. v. Wang Labs., Inc.,* 150 A.D.2d 151, 153, 540 N.Y.S.2d 429, 432 (1st Dep't 1989) (limited warranty may be avoided when warrantor fails to correct the defect within reasonable period of time).

 Marvik contends that the computer system was "never properly or completely installed," that it was "defective," and that Linotype "failed and refused to honor its express warranty to repair and replace defective components free of charge." (Def.1991 Mem. at 12) Siemens and Linotype argue that the system performed to published specifications (Pl.1993 Rep. at 29) and that Marvik's remedies did not fail in their essential purpose. (Pl. & 3d–Party Def.1993 Rep. at 19–21) Because a material issue of fact exists as to whether the express warranty failed in its essential purpose, summary judgment is denied with respect to Marvik's claims against Linotype for breach of implied warranties.

 If Marvik proves at trial that the express warranty failed in its essential purpose, then Marvik will be entitled to sue for damages for breach of implied warranty under N.Y.U.C.C. § 2–714(2). That section provides that the proper measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted unless special circumstances show proximate damages of a different amount." N.Y.U.C.C. § 2–714(2) (McKinney 1993). Marvik may attempt to prove at trial that special circumstances in this case justify recovery other than the difference between the value warranted and the value received. However, Marvik may not recover consequential damages in any event because, as discussed, its waiver of this form of recovery was valid.

B. *Exclusion of Claims Against Assignee*

 In the Agreement, Marvik agreed to waive all defenses and counterclaims against Linotype's assignee, and agreed that the assignee would not be responsible for any obligations or liabilities of Linotype. (Complt Ex. A § 15) To establish the validity of this waiver, Siemens cites cases decided under N.Y.U.C.C. § 9–206(1), which provides that an agreement not to assert defenses against an assignee is enforceable by an assignee who takes her assignment for value, in good faith and without notice of a claim or defense. (Pl. & 3d–Party Def.1991 Mem. at 6)

Section 9–206 is part of Article 9 of the N.Y.U.C.C., which deals with secured transactions. An argument can be made that § 9–206(1) is not relevant here because § 9–206(2) states that that section does not apply where the seller "retains a purchase money security interest in goods." In such cases, Article 2, which governs sales, determines the validity of any disclaimers. As discussed above, Article 2 requires only that the bargained-for remedies may not be unconscionable or fail in their essential purpose. Here, Linotype, the seller, took a purchase money security interest in the computer system, and assigned it to Siemens. The issue is whether the provision in the Agreement waiving assignee liability should be analyzed under § 9–206(1), or under Article 2.

 Although no courts have yet interpreted the language of § 9–206(2) of the N.Y.U.C.C., courts in other jurisdictions with analogous statutes have held that where a seller immediately assigns the purchase money security interest to a third party, that seller did not "retain" the purchase money security interest. *See J.I. Case Credit Corp. v. Skjoldal,* 296 N.W.2d 514, 516 (S.D.1980) (provision with wording identical to that of N.Y.U.C.C. § 9–206(2) "applies only when the purchase money security interest is held by the 'seller' so that the entire transaction retains the character of a sale"); *Agristor Credit Corp. v. Lewellen,* 472 F.Supp. 46, 49 (N.D.Miss.1979) (where seller assigned security interest in property, it did not "retain a purchase money security interest" in goods). Under this reasoning, Article 9 applies to the present case instead of Article 2 because Linotype assigned the purchase money security interest to Siemens. Thus, the assignee of a purchase money security interest is entitled to enforce an agreement not to assert

defenses against the assignee, provided that the assignment was made for value, in good faith and without notice of claims and defenses.

■ Siemens has provided a copy of the Assignment of Chattel Paper as Exhibit B to the Complaint. However, this document is insufficient in itself to establish that Linotype's assignment of the Agreement was made for value, in good faith and without notice of claims and defenses. Because Siemens has failed to provide affidavits or other evidence supporting its motion for summary judgment dismissing Marvik's counterclaims, that motion is denied.

### C. *Rescission*

■ Addendum D of the Agreement gave Marvik a right of rescission exercisable within six months. That addendum provides as follows:

> [Linotype] hereby agrees that the equipment ... will perform to published specifications. Should the equipment fail to perform to said specifications the Customer reserves the right to cancel this contract at no cost to the Customer at any time up to six months after completion of equipment's performance to specifications ...

(Complt Ex. A at Addendum D)

It is undisputed that Marvik sought to cancel the Agreement pursuant to Addendum D on January 31, 1991, but continued to use the computer system after that date. (Def.1991 Mem. at 9) Siemens and Linotype argue that Marvik's continued use of the equipment contradicts the purported cancellation, making the cancellation invalid. (Pl. & 3d–Party Def.1993 Mem. at 16–17; Pl. & 3d–Party Def.1991 Mem. at 9–10) However, Marvik responds that Siemens effectively prevented Marvik from exercising the right of cancellation by refusing to comply with the provision that the cancellation would be at "no cost" to Marvik. (Def.1991 Mem. at 10) Marvik asserts that it was not obligated to return the equipment until Siemens refunded Marvik's deposit and reimbursed Marvik for its installation costs. (Def.1991 Mem. at 10; Def.1993 Mem. in Opp. at 19)

The effectiveness of Marvik's rescission is rendered even more uncertain by the ambiguity of Addendum D itself. The parties dispute whether the computer system "performed to published specifications," (Def.1993 Mem. at 19–20; Pl & 3d–Party Def.1993 Rep. at 30) and dispute also the meaning of the language allowing cancellation within "six months after completion of the equipment's performance to specifications." (Def.1993 Mem. at 17–18; Pl & 3d–Party Def.1993 Rep. at 26–27) Thus, because there are several material issues of fact regarding the validity of the cancellation, Siemens' and Linotype's motion to dismiss the rescission claim is denied.

### D. *Fraud*

■ Marvik alleges that Linotype made "fraudulent misrepresentations" in order to induce Marvik to order the computer system. (3d–Party Complt at ¶¶ 51–57) On December 19, 1991, the court ruled that it would consider fraud claims only with respect to items that did not and could not exist at the time they were contracted to be delivered. (Dec. 19, 1991 Tr. at 10–11) Linotype now moves to dismiss Marvik's fraud claims because there is no evidence of fraud and because the fraud claims merely restate Marvik's contract claims. (Pl.1993 Mem. at 17, 22)

Marvik satisfactorily distinguishes its fraud claim from its contract claims, asserting that

> representations made by [Linotype] in March, 1989 which induced Marvik to execute [the] Agreement were false 'representations of a present fact'—i.e., the existence of fully tested, turnkey system; not of a prospective promise—i.e., something that might have come up later or which interfered with [Linotype's] ability to perform.

(Def.1993 Mem. in Opp. at 30) However, to prove its fraud claim, Marvik contends only that the DIFU software and the interface for the Exabyte Tape Unit were not available at the time of contracting and could not have been incorporated into the computer system on a timely basis. (Def.1993 Mem. in Opp. at 30–31) Marvik has had the opportunity to

conduct discovery on this issue, but has provided the court with no evidence to prove its allegation of "intentional, wilful, wanton and malicious" conduct by Linotype. (3d–Party Complt ¶ 53) In contrast, Linotype asserts its good faith and offers evidence to support this assertion. (Kramer 1991 Rep.Decl., ¶ 2.9(i) & (ii), and accompanying exhibits) Most tellingly, a memorandum from Linotype to the manufacturer of the Exabyte unit dated May 30, 1989 expresses dismay at the delay in delivery of the unit and notes that "virtually all ... orders in backlog include Exabyte and unless we can deliver complete systems, we will not be able to attain required turnover or be paid by customers." (Kramer Rep.Decl. Ex. O). This memorandum strongly supports Linotype's contention that it believed Exabyte would be available for use in Marvik's computer system. Because Marvik has failed to present any evidence that Linotype knew its representations were false, and all the evidence shows it did not know that, summary judgment is granted in favor of Linotype with respect to Marvik's fraud claim.

\* \* \* \* \* \*

For the reasons discussed above, Marvik's claims for fraud, negligence and consequential damages are dismissed. All other motions for summary judgment are denied.

SO ORDERED.